UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

DEBORAH RAMEY AND ROBERT KAIBLE,
individually and on behalf of all others similarly
situated,
              Plaintiffs

V.

U.S. FORENSIC, LLC, GARY L. BELL,
MICHAEL P. GAROVE, HARRY
GEORGE HERNEMAR, WRIGHT
NATIONAL FLOOD INSURANCE
COMPANY, COLONIAL CLAIMS
CORPORATION AND DAVID MAXIME
              Defendants.
-----------------------------------------------------------X

No. _____

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

      Plaintiffs Deborah Ramey and Robert Kaible ("Plaintiffs" or "the Rameys"), by their attorneys, bring this individual and class action complaint pursuant to Federal Rule of Civil Procedure 23 against Defendants U.S. Forensic, LLC ("U.S. Forensic"), Gary L. Bell ("Bell"), Michael P. Garove ("Garove"), Harry George Hernemar ("Hernemar"), Wright National Flood Insurance Company ("Wright Flood"), Colonial Claims Corporation ("Colonial"), and David Maxime ("Maxime") (collectively "Defendants") for violations of RICO, 18 U.S.C. §1962(c). Plaintiffs allege the following upon information and belief, except as to those paragraphs pertaining to Plaintiffs' own actions, which are alleged upon personal knowledge.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

<u>**NATURE OF ACTION**</u>

1.  Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") of similarly situated entities

and individuals (the "Class Members") whose claim was denied in whole or in part based upon an engineering report that was altered by U.S. Forensic after the inspecting engineer's report was submitted to U.S. Forensic for "peer review" or similar purpose.

2. This case involves a scheme whereby U.S. Forensic altered or manipulated engineering reports relied on to process insurance payments under the National Flood Insurance Program ("NFIP"). By altering the reports as described below, U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime benefitted from denial or underpayment of insurance claims. If claims were denied or underpaid, U.S. Forensic, Bell, Garove, Hernemar, Colonial, and Maxime were able to incite and/or extend litigation and continue receiving assignments from Wright. This allowed U.S. Forensic, Colonial, and others to reap the benefit of unnecessary claims handling and litigation expenses. As more fully described below, Wright Flood participated in the scheme so that it could justify denying or underpaying claims. By denying or underpaying claims, Wright Flood avoided being audited by FEMA and potentially having to reimburse FEMA for prior payments received and also received additional unwarranted payments from FEMA for administering the WYO program.

3. Based on information and belief, Wright Flood denied Plaintiffs' insurance claim and denied or underpaid the claims of Class Members based upon fraudulently altered reports issued by U.S. Forensic. Wright Flood had knowledge of the fraud at the time the fraud was committed. In the alternative, Wright Flood was "willfully blind" or engaged in "conscious avoidance" regarding the illegal and fraudulent actions of U.S. Forensic; therefore, Wright Flood is liable for the scheme and for damages suffered by Plaintiffs and Class Members.

2

4. Defendants Colonial and Maxime blindly accepted the fraudulent conclusions touted by U.S. Forensic, Bell, Garove, and Hernemar. On November 17, 2012, Maxime conducted an inspection of Plaintiffs' property. Maxime observed uneven flooring, 5 inch differentials in ceiling height, and foundation framing members out of line, and determined the home was unsafe to live in. Despite this knowledge, Maxime refused to authorize payment of the full policy benefit which the Rameys purchased, and instead requested an engineering analysis which he knew would challenge and undercut the damage. He did this in conjunction with his employer Colonial to satisfy the desire of Wright Flood to reduce payments on covered losses. Maxime and Colonial knew that if they did not work in concert with Wright Flood and its engineer consultants to diminish insurance claims that Colonial and Maxime would not receive additional or future claims assignments from Wright Flood.

5. Plaintiffs and others similarly situated had valid insurance claims denied in whole or in part based on this scheme. Plaintiffs were deprived of thousands of dollars in insurance proceeds as a result of the Defendants unlawful scheme. U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime used mail, telephone, facsimile, and/or email to transact the scheme.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, 1964, 28 U.S.C. §§1331 and 1367. The Court has personal jurisdiction over defendants pursuant to 18 U. S. C. §1965 (a) (b) and (d) as Defendants transacted their affairs in this district and ends of justice require Defendants be brought before this Court.

7. This Court is a proper venue for this action pursuant to 18 U.S.C. §1965 (a) and 28 U.S.C.

§1391 (b) (2). Venue is proper in this judicial district because it is where a substantial part of the events at issue took place.

**PARTIES**

8.  Plaintiffs are individuals who reside in this district.  Plaintiffs owned real property located at 24 Michigan St., Long Beach, New York. Plaintiffs derived rental income from the property at issue in this case.

9.  Defendant U.S. Forensic, LLC is an engineering firm based in Louisiana with its principal offices located in Metairie, Louisiana.

10. Defendant Gary L. Bell is an individual and engineer who founded and is a partner at U.S. Forensic.  He resides in New Orleans, Louisiana. Bell participated in the scheme as more fully described below, and is liable to Plaintiffs for the damage suffered by Plaintiffs.

11. Defendant Michael P. Garove is an individual and engineer and is a partner at U.S. Forensic. He resides in Fort Mills, South Carolina. Garove participated in the scheme as more fully described below, and is liable to Plaintiffs for the damage suffered by Plaintiffs.

12. Defendant Harry George Hernemar is an individual engineer who resides in West New York, New Jersey. Hernemar participated in the scheme as more fully described below, and is liable to Plaintiffs for the damage suffered by Plaintiffs.

13. Defendant Wright National Flood Insurance Company, formerly known as Fidelity National Property & Casualty Insurance Company was and is a private insurance company incorporated under the laws of the State of Florida. Wright Flood is a "Write Your Own" ("WYO") carrier participating in the NFIP pursuant to the National Flood Insurance Act ("NFIA"), as amended 42 U.S.C. §4001, et seq. Wright Flood issued Standard Flood

Insurance Policies (the "Policies") in its own name, as a fiscal agent of the United States, administering federal funds. Pursuant to 44 C.F.R. §62.23 (d) and (i)(6), Wright Flood was and is responsible for arranging the adjustment, settlement, payment, and defense of all claims arising under the Policies. Under 44 C.F.R. §62, Appendix A, the federal government reimburses Wright Flood for fees and expenses incurred in the defense of litigated claims.

14. Defendant Colonial Claims Corporation is an adjusting firm based in Florida with its principal offices located in Dunedin, Florida. Colonial adjusted numerous Hurricane Sandy claims on behalf of Wright Flood and in conjunction with U.S. Forensic.

15. Defendant David Maxime is an individual adjuster. He resides in Mobile, Alabama. Bell participated in the scheme as more fully described below, and is liable to Plaintiffs for the damage suffered by Plaintiffs.

16. As more fully described below, after Hurricane Sandy, Wright Flood assigned Colonial and Maxime to adjust Plaintiffs' claim. Maxime found that the home was unsafe to live in, but instead of paying out full insurance proceeds to which Plaintiffs were entitled, Maxime requested Wright Flood assign an engineer to evaluate the home because he knew such analysis would undermine the significant damages to the home. Wright Flood retained U.S. Forensic to perform an engineering analysis of the property. U.S. Forensic, in turn, assigned Hernemar to inspect Plaintiffs' house for damage and write a report of his findings. When U.S. Forensic received the report from Hernemar that determined Plaintiffs' house was a total loss, U.S. Forensic and Garove fraudulently altered the report. The altered report was used by the flood insurance carrier, Wright Flood, as an artifice to deny Plaintiffs' legitimate claim for insurance benefits.

5

17. U.S. Forensic, Garove, Bell, Hernemar, Colonial, and Maxime know that Wright Flood garners economic benefit from the unwarranted denial of NFIP claims and Wright Flood will in turn continue employing U.S. Forensic, Bell, Garove, Hernemar, Colonial, and Maxime and pay them unwarranted consulting fees for their engineering and claims handling work.  U.S. Forensic, Bell, Garove, Hernemar, Colonial, and Maxime know that the money they receive for their services comes from funds administered pursuant to the NFIP.

18. As fully described below, Wright Flood participated in the scheme to wrongfully and illegally deny Plaintiffs' claim, and the claims of Class Members. Based on FEMA's methods for reimbursing WYO carriers for the costs associated with administering the WYO program, Wright Flood profits by systematically increasing claim handling expenses, including amounts paid to U.S. Forensic and Colonial. An unintended consequence of the WYO reimbursement protocol is that the more expenses Wright Flood can attribute to claims handling, the more money it will receive from FEMA and the NFIP for administering the program. A 2009 report of the U.S. Government Accountability Office ("GAO") found that WYO carriers received reimbursement for expenses above the amount actually incurred. Wright Flood and its claims handling consultants, such as U.S. Forensic, Bell, Garove, Hernemar, Colonial and Maxime collectively stood to benefit from increasing expenses and passing them along to FEMA for reimbursement.

19. Further, Wright Flood knows that it may be responsible if a claim is overpaid.  Wright Flood risks an audit by FEMA and/or other governmental entities if amounts paid out exceed an expected threshold. Therefore, Wright Flood systematically sought to underpay legitimate

claims and either knowingly or with willful blindness accepted the fraudulent engineering and claims handling analysis touted by U.S. Forensic, Garove, Bell, and Hernemar and blindly accepted by Colonial and Maxime for their mutual benefit. Wright Flood's attorneys have acknowledged the shockingly high cost associated with defending the reprehensible practices employed by U.S. Forensic and others for Hurricane Sandy claims.

20. Based on information and belief, as more fully outlined below, Colonial and Maxime refused to recommend full payment of claims, even when it was obvious that liability was clear.  Instead, Colonial and Maxime routinely requested an engineering analysis if the claim seemed to be significant.  U.S. Forensic, Bell, Garove, and Hernemar altered and rewrote the reports that were provided to the flood carriers so it could deny, in whole or in part, Plaintiffs' claim and the claims of others similarly situated.  This scheme was used to deny Plaintiffs' claim and the legitimate claims of numerous Class Members.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

21. On October 29, 2012, Hurricane Sandy hit New York and surrounding areas, causing severe damage to homes and businesses. Plaintiffs' house located at 24 Michigan Street, Long Beach, New York suffered a direct hit from Hurricane Sandy's storm surge and flood water. Plaintiffs made a claim with their flood insurance carrier, Wright Flood.  Wright Flood hired Colonial and adjuster David Maxime to inspect Plaintiffs' property and document the claim.

22. During his November 13, 2012 inspection, Maxime found substantial flood damage[1] and noted the house's flooring appeared to have dropped and noted a five inch differential in the

---

[1] *See* photographs of the Rameys' damaged home, attached hereto and incorporated herein as Plaintiffs' Exhibit 1; *see also* Adjuster's Preliminary Report, attached hereto and incorporated herein as Plaintiffs' Exhibit 2.

ceiling height.[2]   Maxime concluded that Plaintiffs' house was "**unsafe to live in**."[3] However, instead of recommending that the home be deemed a total loss and the full policy benefit paid to the Rameys, Maxime requested an engineer be sent to evaluate the home.[4]

23. Wright Flood assigned U.S. Forensic to conduct an engineering analysis. U.S. Forensic, in turn, assigned George Hernemar, who claims that he had recently been hired by U.S. Forensic after responding to an ad on Craigslist.[5]   Mr. Hernemar inspected Plaintiffs' property on December 4, 2012 and prepared a report dated December 9, 2012 concluding that hydrodynamic forces caused the foundation walls around the southwest corner of the building to collapse.[6]   The report further concluded that repair of the building was not economically viable and the house should be demolished.[7] This report compelled full payment of Plaintiffs' insurance claim.

24. The December 9th report was never provided to Plaintiffs.  Instead, U.S. Forensic and its engineers in a remote office materially altered key aspects of the on-site engineer's report including his conclusion that the property "should be demolished and rebuilt in its entirety."[8]   A contradictory report, dated January 7, 2013, authored by Garove who never inspected the property, was instead provided to Plaintiffs.[9]   As described below the existence of Hernemar's December 9th report was later discovered, but only by chance.

---

[2] *See* Plaintiffs' Exhibit 2.
[3] *See* Adjuster's Request for Engineer and reason for request of engineer assistance, attached hereto and incorporated herein as Plaintiffs' Exhibit 3.
[4] *Id.*
[5] *See* October 16, 2014 hearing transcript, attached hereto and incorporated herein as Plaintiffs' Exhibit 4 at 44:13-21.
[6] *See* December 9, 2012 report, attached hereto and incorporated herein as Plaintiffs' Exhibit 5.
[7] *Id.*
[8] *Id.*
[9] *See* January 7, 2013 report, attached hereto and incorporated herein as Plaintiffs' Exhibit 6.

25. The magnitude of the manipulation of the reports cannot fully be appreciated without a side-by-side comparison:

**December 9, 2012 Report**:

Results and Conclusions
Based upon the information obtained and considered to date, we offer the following opinions:

1) The physical evidence observed at the property indicated that the subject building was structural damaged by hydrodynamic forces associated with the flood event of October 29, 2012. The hydrodynamic forces appear to have caused the foundation walls around the south-west corner of the building to collapse.

2) The extent of the overall damages of the building, its needed scope of repair combined with the age of the building and its simple structure, leads us to conclude that a repair of the building is not economically viable.

Scope of Repairs
The extent of the overall damages of the building, its needed extent of repair combined with the age of the building and its simple structure, leads us to conclude that a repair of the building is not economically viable. Additionally the collapsed foundation that causes the entire building to lean, also the circumstance that moist sand reaches above the foundation and is in direct contact with the wood structure above the foundation, it is likely that the adjacent wood structure is not salvageable.

The building should be demolished and rebuilt in its entirety.

**January 7, 2013 Report:**

Results and Conclusions
Based upon the information obtained and considered to date, we offer the following opinions:

1) The physical evidence observed at the property indicated that the subject building was not structurally damaged by hydrodynamic forces, hydrostatic forces, scour or erosion of the supporting soils, or buoyancy forces of the floodwaters associated with the subject flood event.

2) The physical evidence observed at the subject property indicated that the uneven roof slopes, leaning exterior walls and the uneven floor surfaces within the interior of the building, were the result of long term differential movement of the building and foundation that was caused by long-term differential movement of the supporting soils at the site and long-term deflection of the building framing.

**NO SCOPE OF REPAIRS**

The redlined version of the December 9th report showing all of U.S. Forensic and Garove's unwarranted changes to the report was produced by Wright Flood and is attached hereto and incorporated herein as **Plaintiffs' Exhibit 7**.

26. A fraud was perpetrated on Plaintiffs.  As a result, their insurance claim was never fully paid and their property was condemned by the City of Long Beach and demolished.[10]  Plaintiffs were entitled to collect the full $250,000 proceeds for the damage to their home, but instead,

---

[10] *See* City of Long Beach Notice of Determination and Permit to Demolish, attached hereto and incorporated herein as Plaintiffs' Exhibit 8; *see also* Plaintiffs' Exhibit 4 at 22:13-14.

they were paid less than $80,000 based on the altered report. With no rental income Plaintiffs were forced to sell 24 Michigan Street for the value of the lot.[11]

27. Plaintiffs first obtained a full copy of the December 9, 2012 report at an evidentiary hearing on October 16, 2014. Suspiciously, the alterations to Hernemar's December 9th report were made by Michael Garove,[12] another U.S. Forensic engineer who neither inspected Plaintiffs' home nor physically observed the damage firsthand.[13]   Garove simply made outcome-oriented findings to support his pre-determined conclusions. Garove did not seal or sign the report and failed to document his changes in violation of New York laws which state:

> All plans, specifications, plats and reports relating to the construction or alteration of buildings or structures prepared by such professional engineer and all plans, specifications, plats and reports prepared by such land surveyor or by a full-time or part-time subordinate under his supervision, shall be stamped with such seal and shall also be signed, on the original with the personal signature of such professional engineer or land surveyor when filed with public officials.[14]

> To all plans, specifications, plats and reports to which the seal of a professional engineer or land surveyor has been applied, there shall also be applied a stamp with appropriate wording warning that it is a violation of this law for any person, unless he is acting under the direction of a licensed professional engineer or land surveyor, to alter an item in any way. **If an item bearing the seal of an engineer or land surveyor is altered, the altering engineer or land surveyor shall affix to the item his seal and the notation "altered by" followed by his signature and the date of such alteration, and a specific description of the alteration.**[15]

28. When comparing the December 9th and January 7th reports, it is important to note that not only did the conclusions change but the ***facts supporting the conclusions*** changed despite

---

[11] *See* Plaintiffs' Exhibit 4 at 6:7-12; 22:5-18.
[12] *See* Plaintiffs' Exhibit 4 at 156:1-7; 145:20-147:2.
[13] *Id.* at 164: 9-14.
[14] NY EDUC § 7209(1)(2012).
[15] NY EDUC § 7209(2)(2012).

sworn testimony from both Hernemar and Garove that they had no new information and there were no additional observations of the property:

***George Hernemar October 16, 2014 testimony***:

Q.      So there was no site inspection done. You only did two. Correct?

A.      Yes.

Q.      One in December. Correct?

A.      Yes.

Q.      One in January 25 of 2013. Correct?

A.      Yes.

Q.      So there was no additional site inspection done between December, the one you did in December, and the first of January before you issued the January of 7th report which is marked as Exhibit 3. Correct?

A.      Yes. [16]

***Michael Garove October 16, 2014 testimony***:

Q.      When the insurance company's counsel asked you, on his questions, about what you went through and your analysis of what you saw from the photos and the report – is that right? You didn't go do an inspection of the home. Correct?

A.      That's correct. The photos are not the only thing I reviewed in making my determination.

Q.      What else did you review?

A.      Measurements and observations which were provided within the original report.

Q.      Okay.[17]

---

[16] *See* Plaintiffs' Exhibit 4 at 70:5-16.
[17] *See* Plaintiffs' Exhibit 4 at 164:9-19.

29. Tellingly, Garove's alteration of the report *removes* key evidence which supports the initial conclusion that the Rameys' home was a total loss. Manipulating the engineering observations was done under the guise of "peer review" according to Mr. Garove.  Garove removed the following key evidence to support his contradictory conclusion:

- The flooding deposited sand on the living room floor that had penetrated the gaps around the entrance door.[18]

- High water marks on all sides on the inside and outside of the building were clearly visible.[19]

- The subject building is located in the vicinity of the shore which means that the building at the south-west corner was lateral impacted by forces associated with the momentum of the moving water (hydrodynamic forces).[20]

- The south-west corner is not shielded by other buildings from waves from the shore.[21]

- The crawl space could not be thoroughly inspected due to congestions of lose floor insulation hanging down, debris and a stark smell of undetermined petroleum products.[22]

- The entire floor of the building first floor sloped from north-east downward toward south-west. The south-west corner was measured to be approximately 4.7 inches lower than the north-east corner of the building.[23]

- The deposit of sand was mainly along the south and west perimeter of the building.[24]

- We assume that the slope of the floor and the leaning of the walls appeared after the recent flood, as Ms. Deborah Ramey claims. It is not likely that Ms. Deborah Ramey would find it worthwhile to invest in new flooring, as she did 2 years ago, <u>for a floor in the current condition that yields when walking on it and with a noticeable ridge on it and with a noticeable slope.</u>[25]

---

[18] *See* Exhibit 7 at 6.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.* at 7.
[23] *Id.* at 9.
[24] *Id.* at 10.
[25] *Id.* (emphasis added).

30. In addition, to support his conclusions, Garove boldly fabricates factual observations that were impossible at the time. The December 9th report documents Hernemar's inability to access the crawl space beneath Plaintiffs' property.[26] The altered report deletes any reference to this inability to inspect and replaces it with "no scoured soils were observed around any of the foundation piers, foundation walls, or *anywhere* else beneath the building."[27] This is simply a false statement, changed to support the change in conclusion.

31. Hernemar's supplemental report dated January 25, 2013,[28] which was also altered by "peer review" analysis,[29] still insists that, "On our previous inspection, the only entrance to the crawl space was blocked by a tank inside the crawl space."[30] Hernemar also testified that on his first inspection, he had been unable to enter the crawl space.[31] The reports are replete with factual manipulations in support of the altered conclusion.[32] Yet, when the report was received by Colonial and Maxime, they willfully ignored the fact that the report contradicted the facts observed first-hand by Maxime and made known to Colonial. Colonial and Maxime blindly accepted the fraudulent and outcome oriented report of U.S. Forensic because Colonial and Maxime knew this was the result desired by Wright Flood. To contradict Wright Flood would jeopardize continued and future business and revenue.

---

[26] *See* Plaintiffs' Exhibit 5 at 5.

[27] *See* Plaintiffs' Exhibit 6 at Page 5.

[28] *See* Supplemental Report dated January 25, 2013, attached hereto and incorporated herein as Plaintiffs Exhibit 9.

[29] *See* Supplemental Report dated January 28, 2013, attached hereto and incorporated herein as Plaintiffs Exhibit 10.

[30] *See* Plaintiffs' Exhibit 9.

[31] *See* Plaintiffs' Exhibit 4 at 61:20-21; 107:21-22.

[32] *See* Plaintiffs' Exhibits 7, 9 and 10. To date, Plaintiffs are aware of 5 U.S. Forensic reports for Plaintiffs property all purportedly authored by George Hernemar: (1) December 9, 2012, (2) December 28, 2012 (Plaintiffs have only seen the stamped conclusion page for this report), (3) January 7, 2013, (4) January 25, 2013, and (5) January 28, 2013. Curiously, Hernemar's own file contains only (1) December 9, 2012, (2) December 28, 2012 stamped conclusions, (3) January 25, 2013, and (4) January 28, 2013 stamped conclusions. At the time of the October 16, 2014 hearing, Hernemar was not in possession of the only two reports provided to Plaintiffs prior to litigation: (1) January 7, 2013, and (2) January 28, 2013.

32. The altered conclusions used by Garove to undermine Plaintiffs' claim for insurance benefits were not the result of sound engineering methodology and instead appear to be boilerplate language. These altered conclusions appear in reports in at least 25 other cases. Those reports were "peer reviewed" by U.S. Forensic.[33]  Only three of these reports are sealed, and oddly, they are all sealed by Garove.[34] The repeated use of this boilerplate language demonstrates a pre-determination of Garove's conclusions and intent to manipulate the facts of Plaintiffs' case to fit those conclusions.

33. Garove's routine practice of recycling opinions is again demonstrated through his report on a property only minutes away from Plaintiffs'. Nearly verbatim language regarding Plaintiffs' property also appears in the Saggese report, which is attached hereto as **Plaintiffs' Exhibit 12.** The identical language used by Garove is highlighted in red.  Mr. Garove simply used his cut and paste tool to alter the engineering report and fraudulently deny Plaintiffs over $150,000 in insurance benefits to which they were entitled.  This was not an isolated incident, as Plaintiffs have uncovered 25 additional reports with nearly verbatim conclusions.[35] Further, Hernemar testified that he had personally authored approximately 50 reports that had been subjected to this same "peer review" process by U.S. Forensic.

34. Plaintiffs have obtained the billing invoices from U.S. Forensic on 19 files. Curiously, each file shows that the engineer billed for exactly 14 hours regardless of distance traveled, time spent, or the complexity of the damage observed and investigated.[36]  This "boilerplate

---

[33] *See* reports prepared by U.S. Forensic, attached hereto and incorporated herein as Plaintiffs' Exhibit 11.
[34] *Id.* at pages 13, 50, and 59.
[35] *See* Plaintiffs' Exhibit 11.
[36] *See* U.S. Forensic invoices, attached hereto and incorporated herein as Plaintiffs' Exhibit 13.

billing" is further evidence that U.S. Forensic, Bell, Garove, and Hernemar were not evaluating the damage at each home on its own merits. Instead, U.S. Forensic, Bell, Garove, and Hernemar were engaged in an ongoing scheme to concoct false engineering reports for use by Wright Flood to deny policy benefits to insureds under the NFIP. Wright Flood paid fraudulent invoices without question with federal funds.

35. In an effort to conceal their fraudulent scheme, U.S. Forensic, Bell, Garove, Hernemar, and Wright Flood withheld the unaltered December 9th report from Plaintiffs and refused to produce evidence of the "peer review" process employed by U.S. Forensic until ordered to do so.  The very existence of the original report was only a chance discovery.  Hernemar returned to Plaintiffs' property for a second inspection and Hernemar had a copy of the unaltered report on his clipboard.  Plaintiff Robert Kaible was able to photograph it with his cell phone.[37]  Upon learning of the existence of the December 9th report and that it was withheld from production, Plaintiffs' legal counsel sought a copy of the initial report and all evidence of the fraudulent alteration of the December 9th report through a separate proceeding.

36. The Honorable Gary Brown conducted an evidentiary hearing on October 16, 2014 regarding the altered documentation in Plaintiffs' claim.  At the hearing, Hernemar and Garove gave conflicting sworn testimony regarding the altered engineering reports.  Hernemar swore that he was the author and that no one had altered or suggested changes for the report.[38]  In direct contradiction, Garove testified he was the author of the report.[39]  The

---

[37] *See* cell phone photographs, attached hereto and incorporated herein as Plaintiffs' Exhibit 14.
[38] *See* Plaintiffs' Exhibit 4 at 57:17-24.
[39] *See* Plaintiffs' Exhibit 4 at 156:1-7.

testimony at the October 16 hearing is clear – the report was not only altered, but rewritten by an engineer who had never observed the property.[40]

37. Hernemar was either aware of this "peer review" process or willfully blind to its existence. Hernemar stood to financially gain from the engineering fees paid to him by U.S. Forensic in this case and others, so he continued to participate.  In the alternative, Hernemar is liable under the doctrine of conscious avoidance because he knew his report was altered, and he was "willfully blind" to the extent of the alteration and the inaccurate factual observations and conclusions.

38. Judge Brown took numerous issues with Garove and Hernemar's testimony and called into question U.S. Forensic's entire "peer review" process which he dubbed "reprehensible" and "flawed."[41]  Judge Brown's scathing order finds:

> [T]he evidence adduced in this matter demonstrates that U.S. Forensic, an engineering firm retained by defendant Wright National Flood Insurance Company to examine a storm-battered house in Long Beach, New York, unfairly thwarted reasoned consideration of [Ramey and Raisfeld's] claim through the issuance of a baseless report. The engineer sent by U.S. Forensic opined in a written report that the home at issue had been damaged beyond repair by Hurricane Sandy. A second engineer, who did little more than review the photographs taken by the inspecting engineer, secretly rewrote the report, reversing its conclusion to indicate that the house had not been damaged by the storm, and attributing—without sufficient evidence—defects in the home to long-term deterioration. This process, euphemistically dubbed a "peer review" by U.S. Forensic, was concealed by design from the homeowners, remained uncovered during the Court-assisted discovery process and came to light through near happenstance. In a misguided attempt to defend these flawed practices, [Wright National Flood Insurance Company] has elicited evidence that this "peer review" process may have affected hundreds of Hurricane Sandy flood insurance claims—and possibly more.[42]

---

[40] *See* Plaintiffs' Exhibit 4 at 164: 9-14
[41] *See* Judge Brown's November 7, 2014 opinion, attached hereto and incorporated herein as Plaintiffs' Exhibit 15 at 2-3.
[42] *Id.* at 2-3 (emphasis added).

39. Even after these "reprehensible" and "indefensible" engineering practices came to light, counsel for Wright Flood did little to investigate the serious allegations.[43] Wright Flood's counsel, who also directly benefits from increased litigation costs, has continued to strenuously defend the reprehensible practices that were exposed.[44]  The legal fees incurred in defense of this unlawful enterprise will be passed through to American taxpayers by virtue of the federal funding of the WYO program. As discussed herein, Wright Flood benefits directly from an increase in claims handling and litigation expenses. Its legal counsel directly benefits from receiving these unjustified fees.  Wright Flood's counsel has gone on record to state that the defense cost for Hurricane Sandy claims is likely to reach nine figures ($100,000,000).[45]

40. Unfortunately, the Rameys' case is not an isolated incident, as demonstrated by the stories of the following families:

*The Giovincos*

41. Joseph and Patricia Giovinco are also Long Beach, New York homeowners whose home was devastated by Hurricane Sandy. This home was passed down to the Giovincos by Patricia's grandparents and was the Giovincos' first home together.[46] They have since made their primary residence in Lynbrook, New York, but kept the Long Beach home as an investment property to secure their children's education.[47] When Hurricane Sandy practically destroyed their Long Beach house, their insurance claim was wrongfully denied

---

[43] *See* Plaintiffs' Exhibit 15 at 21.
[44] *Id.*
[45] *See* Plaintiffs' Exhibit 16 attached hereto and incorporated herein, at 10; see also Plaintiffs' Exhibit 4 at 176:21-177:14.
[46] *See* Plaintiffs' Exhibit 17 attached hereto and incorporated herein, at 1.
[47] *Id.*

based on a fraudulent engineering report authored by U.S. Forensic and Garove.[48] Not coincidentally, the Giovincos were insured by Wright Flood and Colonial and Maxime performed the claim adjustment.[49]

42. In an all too familiar fact pattern, Garove authored the Giovincos' engineering report without ever visiting the site.[50]  Instead, the property was inspected by Asher Cohen, who is not a licensed New York engineer. Without observing the damage firsthand, Garove sat in a remote location and inserted boilerplate conclusions to the Giovincos' report that he knew would be used by Wright Flood to deny the claim. Multiple professionals have rebutted the findings of Garove and U.S. Forensic and stated the reports showed false findings,[51] but in furtherance of the unlawful scheme, Wright Flood continued to wrongfully deny the claim.

43. In a heartfelt letter to Governor Cuomo, the Giovincos described the fraud perpetrated by Wright Flood, U.S. Forensic, and Garove and the wrongful denial of their claim.[52] Not even this honest appeal motivated Wright Flood, U.S. Forensic, or Garove to abandon the unlawful scheme. Instead, the Giovincos are still waiting for justice and full payment of their legitimate claim.

### Michael Seemann

44. Michael Seemann, a Building Inspector for the City of Long Beach and a volunteer firefighter, owns 237 East Fulton Street in Long Beach, New York. Hurricane Sandy destroyed Mr. Seemann's house. He received a substantial damage letter from the City of Long Beach, along with a demolition permit.  Before clearing his lot, Seemann made a claim

---

[48] *Id.*
[49] *Id.* at 2.
[50] *Id.*
[51] *Id.*
[52] *Id.*

with his insurance carrier, Wright Flood. Wright Flood hired U.S. Forensic to perform the engineering analysis. U.S. Forensic, in turn, assigned Dana Race, who is not a licensed engineer in New York, to inspect the property.

45. Shortly thereafter, the unlawful enterprise created by Defendants claimed yet another victim. Garove, without ever visiting the property and observing the damage firsthand, authored, signed, and sealed an engineering report concluding that the home was not structurally damaged by the Hurricane Sandy floodwaters.[53]  Using the same boilerplate language and cut and paste tool, the U.S. Forensic Enterprise fraudulently manipulated the engineering analysis and Wright Flood wrongfully denied Mr. Seemann's claim.

46. With nowhere left to turn, Mr. Seemann sought the intervention of U.S. Senator Charles Schumer. Senator Schumer contacted FEMA to inquire about the unwarranted denial of Mr. Schumer's claim. In response to Senator Schumers' inquiry, FEMA parroted the fraudulent findings of U.S. Forensic and Garove.[54] Mr. Seemann has yet to be paid the full insurance proceeds to which he is entitled.

*Brian Braddish*

47. Brian Braddish is yet another Wright Flood insured who was deceived by this criminal enterprise.  Mr. Braddish's home is located at 740 West Bay Drive, in the heart of Long Beach. The home suffered severe damage following Hurricane Sandy. Upon making a claim with Wright Flood, U.S. Forensic was assigned to perform the engineering analysis.  Allan Abatta performed the inspection and analysis of Mr. Braddish's property.[55]

---

[53] *See* Plaintiffs' Exhibit 11 at 68-70.
[54] *See* Plaintiffs' Exhibit 18 attached hereto and incorporated herein.
[55] *See* Plaintiffs' Exhibit 11 at 1.

48. Despite U.S. Forensic sending a different engineer to this different property, the results and conclusions remain the same, almost down to the sentence structure.[56] Mr. Braddish's claim was wrongfully denied using the same widespread fraudulent cut and paste exercise employed by U.S. Forensic. Like the Giovincos and Mr. Seemann, Mr. Braddish has yet to receive what he is owed under his Wright Flood policy.

### *Kathy Hanlon and Hector Preito*

49. Kathy Hanlon and Hector Preito's home is located at 623 West Olive Street in Long Beach, New York. After Hurricane Sandy, Kathy and Hector's home was so damaged that they received a substantial damage determination letter from the City of Long Beach. Kathy and Hector filed a claim with their flood insurance carrier, Wright Flood and U.S. Forensic was assigned to perform an engineering analysis.

50. Once again, U.S. Forensic sent Asher Cohen, who is not a licensed New York engineer, to perform the site inspection. However, the final report reaches the same verbatim boilerplate conclusion that the damage to the home was a result of long term distortion of the framing unrelated to the flood.[57] The final engineering report provided to Kathy and Hector was prepared by Jason Grover, an engineer with no firsthand knowledge of the property or the damage.

51. U.S. Forensic and Wright Flood concealed the fraudulent nature of the report from Kathy and Hector. This family was unaware of the fraudulent scheme to deny legitimate claims until Judge Brown's order and memorandum were released and corresponding newspaper articles regarding the widespread fraud surfaced. Tragically for Kathy and Hector, U.S.

---

[56] *See* Plaintiffs' Exhibit 11 at 3.
[57] *Id.* at 32-34.

Forensic, Wright, and other participants were able to conceal the fraud until days after the Proof of Loss deadline had passed, leaving them no recourse at this time. Had Defendants complied with the Case Management Orders governing Hurricane Sandy cases within the timelines ordered and produced *all* reports as required, this fraudulent scheme would have been revealed nearly a year ago, giving those affected time to file a proof of loss for legitimate claims.  Kathy and Hector represent the potentially thousands of homeowners prevented from filing proofs of loss because of the U.S. Forensic Enterprise's fraudulent concealment of this scheme.

52. It is undeniable that the unlawful scheme perpetrated by Defendants is an not isolated event but an ongoing criminal organization.  These families were all denied, in whole or in part, on different dates and all victimized under similar circumstances to Plaintiffs. The fraudulent reports, fraudulent payments, and fraudulent reasons for denying Plaintiffs' and Class Members' claims were provided to victims through mail or wire transfer.  Each of these denials and payments is a separate predicate act of racketeering activity occurring within the last 10 years.

### *Liability of Wright Flood, Colonial, and Maxime*

53. Wright Flood, Colonial, and Maxime knew or were willfully blind to the fact that U.S. Forensic, Bell, Garove, and Hernemar were fraudulently altering engineering reports to deny legitimate claims. Wright Flood, Colonial, and Maxime were in possession of numerous reports from U.S. Forensic which contained the same boilerplate conclusions. In many instances, including Plaintiffs' claim, the engineering report directly contradicted facts observed by adjusters like Maxime who deemed Plaintiffs' property unsafe to live in.

21

Further, Plaintiffs placed "about 45 phone calls" to Wright Flood complaining about the inaccuracy of the altered report which was provided to Plaintiffs.

54. Wright Flood's own internal documents confirm that it was on notice of the issue with the engineering report:[58]

> Spoke with insured, who disputes the engineer rpt. Says that due to all of the sand around the foundation and the 3' of sand in crawl space, eng. couldn't even examine foundation and crawl space.   Contacting Joe Griffith.

Despite the fact that Wright Flood, Colonial, and Maxime knew or should have known of the alteration of the engineering report, Wright Flood used the falsified report as an excuse to deny Plaintiffs' claim for benefits.

55. Wright Flood's, Colonial's, and Maxime's failure to investigate facially inaccurate engineering reports after having the above knowledge constitutes "willful blindness" to the illegal and fraudulent actions of U.S. Forensic, Bell, Garove, and Hernemar; therefore, Wright Flood, Colonial, and Maxime  are liable under the doctrine of conscious avoidance.

56. The doctrine of conscious avoidance stands for the principle that a person who deliberately shuts his eyes to an obvious means of knowledge has sufficient *mens rea* for the "knowing" element of a criminal offense.[59] Even in a conspiracy case in which specific intent must be proven, such as mail fraud cases, conscious avoidance is sufficient to establish *mens rea*.[60]

57. In newspaper articles written about Judge Brown's November 7, 2014 order, Wright Flood's President Neal Conolly unbelievably defends the actions of U.S. Forensic and Wright Flood.[61]

---

[58] *See* Log notes attached hereto and incorporated herein as Plaintiffs' Exhibit 19 at page 4.
[59] *United States v. Quinones*, 635 F.3d 590, 601 (2d Cir. 2011).
[60] *United States v. Beech-Nut Nutrition Corp*., 871 F.2d 1181, 1195 (2d Cir. 1989).
[61] Joe Ryan*, Sandy insurers may have falsely denied Llers' claims, federal judge says* , NEWSDAY, Nov. 13, 2014, *available at* http://www.newsday.com/business/sandy-insurers-may-have-falsely-denied-liers-claims-federal-judge-1.9614420 and attached hereto as Exhibit 20; see also Christine Simmons, *Judge Fears Manipulation of Claims from Sandy*, NEW YORK LAW JOURNAL, Nov. 13, 2014, available at

Conolly states he is "shocked that anybody would be surprised that somebody who wasn't able to see the full condition (of the building) could change their mind."[62]  This statement is blatantly misleading for two reasons.  First, a simple review of the timeline of the Rameys claim shows that the report was changed before a second inspection ever occurred.  Second, Hernemar, who inspected the property, did not make the changes to the report. Rather, Garove rewrote the report without *ever* seeing the property. Wright Flood is liable for the illegal actions of U.S. Forensic, Bell, Garove, Hernemar, Colonial, and Maxime in Plaintiffs' case and Wright Flood is liable for U.S. Forensic's, Bell's, Garove's, and Hernemar's actions in the altering of reports in Class Members' cases.

58. Wright Flood stands to benefit from this fraudulent scheme both directly and indirectly. Based on information and belief, due to the way in which the WYO program is funded by FEMA, Wright Flood actually reaps greater profit by driving up claims handling expenses and denying legitimate claims. Further, Wright Flood avoids the threat of a government audit by reducing the amount paid on claims, even if legitimate. Wright Flood is highly motivated to avoid an audit. In 2009, the GAO audited other WYO carriers and determined that they had significantly overbilled FEMA for administering the WYO program.  Wright Flood is motivated by the desire to keep their ill-gotten gains by driving up claims handling expenses while reducing the amount paid on claims. Wright Flood acted in concert with U.S. Forensic, Bell, Garove, Hernemar, Colonial, and Maxime to achieve this unlawful purpose.

---

http://www.newyorklawjournal.com/home/id=1202676256938/Judge-Fears-Manipulation-of-Claims-From-Sandy?mcode=1202617075062&curindex=0&slreturn=20141021141437 and attached hereto as Exhibit 21.

[62] *See* Plaintiffs' Exhibit 21.

59. Colonial and Maxime also stand to benefit from this fraudulent scheme. The more Colonial and Maxime contributes to Wright Flood's inflated expenses, the easier it is for Colonial and Maxime to ensure future assignments and expense payments from Wright Flood.

## RICO ALLEGATIONS

### The U.S. Forensic Enterprise

60. U.S. Forensic is a "person" within the meaning of 18 U.S.C. §1961(3).

61. Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals and entities associated in fact that Plaintiffs refer to as the U.S. Forensic Enterprise: (1) U.S. Forensic; (2) Gary Bell; (3) Michael Garove; (4) Harry George Hernemar; (5) Wright Flood; (6) Colonial; and (7) David Maxime.

62. The U.S. Forensic Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce. The members of the U.S. Forensic Enterprise function as a continuing unit as described below and share the common purpose of creating illegitimate engineering reports to be used to fraudulently deny, in whole or in part, insurance claims for their individual and collective economic gain.

63. While U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime participate in and are members and parts of the U.S. Forensic Enterprise, they also have an existence separate and distinct from the enterprise.  The common goal was to reduce payments on legitimate insurance claims, drive up costs of claims handling and investigation of these claims. This generated profits for the enterprise as a whole and for participating individuals. Defendant Wright Flood also benefitted by avoiding a government audit through inflating costs and reducing claims paid.

64. In order to successfully defraud Plaintiffs and Class Members in the manner set forth above, U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime needed a system that would allow them to deny insurance claims, in whole or in part, and thereby avoid an audit by FEMA. Additionally, Wright Flood stood to benefit directly from increasing claims handling expenses due to the manner in which FEMA reimburses WYO carriers for their participation in the NFIP. Due to incentives in the reimbursement program, WYO carriers can actually profit by incurring additional expenses. U.S. Forensic, Bell, Garove, Hernemar, Colonial, and Maxime could spur and prolong litigation so that they could charge and collect unnecessary expense and litigation support service fees and expenses. Wright Flood participated in the scheme so it could justify denying or underpaying claims; therefore it could avoid an audit by FEMA and having to reimburse FEMA for overpayments.

65. In furtherance of its unlawful enterprise, U.S. Forensic routinely submitted billing invoices to Wright Flood which did not accurately reflect the actual work performed. These invoices were paid by Wright Flood from federal funds held in trust for the purpose of administering the WYO program. Based on information and belief, these invoices and the remittance of funds in satisfaction, were transmitted through U.S. mail and/or wire transfers. These invoices and the resulting payments were fraudulent and use of U.S. mail and wire transfers to transmit them is a violation of 18 U.S.C. § 1341 and §1343.

66. U.S. Forensic controls and operates the U.S. Forensic Enterprise as follows:

    (a) By falsifying and altering engineering reports in order that the U.S. Forensic Enterprise can deny or underpay valid insurance claims;

     (b) By falsifying and altering engineering reports to be utilized to deny or underpay valid insurance claims U.S. Forensic, Bell, Garove, and Hernemar can charge unnecessary and/or inflated litigation costs;

     (c) By falsifying and altering engineering reports to be utilized to deny or underpay valid insurance claims, Wright Flood can avoid being audited by FEMA and can avoid reimbursing FEMA for an overpayment of a claim; and

     (d) By falsifying and altering engineering reports to increase claims handling costs, the U.S. Forensic Enterprise passes on the expenses to FEMA to justify additional payments to Wright Flood.

67. As set forth above, the U.S. Forensic Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime engage.

**Predicate Acts**

68. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud). As set forth below, U.S. Forensic, Hernemar, Wright Flood, Colonial, and Maxime have and continue to engage in conduct violating each of these laws to effectuate their scheme.

69. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations, or promises, U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to contracts, invoices, correspondence, payments, and altered reports.

26

70. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime also in violation of 18 U.S.C. §1343, transmitted and received by wire matter and things which include but are not limited to contracts, invoices, correspondence, payments, and altered reports.

71. The matter and things sent by U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime  via the Postal Service, commercial carrier, wire or other interstate electronic media include, *inter alia:*

    a.   altered reports containing false and fraudulent misrepresentations that were utilized by Wright Flood to improperly deny coverage to or underpay Plaintiffs' claim and  claims of members of the class;

    b.   fraudulent invoices reflecting work not actually done; and

    c.   materials that falsely and fraudulently described the services performed.

72. Other communications sent through or received from the Postal Service, commercial carrier, or interstate wire transmission by U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime  included information or communications in furtherance of or necessary to effectuate the scheme.

73. U.S. Forensic's, Bell's, Garove's, Hernemar's, Wright Flood's, Colonial's, and Maxime's misrepresentations, acts of concealment, and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the Class and for the purpose of denying Plaintiffs' claim and the claims of Class Members. This was done for the purpose of reducing paid claims to avoid an audit which would lead to the detection of

improper payments and increased cost of claims handling to the direct financial benefit of Defendants.

74. U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material and would be relied upon by Plaintiffs and Class Members. Plaintiffs and Class Members were defrauded as a result of the misrepresentations and omissions as set forth above. In many instances, the fraud involved tens of thousands of dollars in legitimate insurance claims that were denied.

75. As a result, U.S. Forensic, Bell, Garove, Hernemar, Colonial, and Maxime have fraudulently obtained engineering and litigation support fees and expenses.   These Defendants were able to charge for unwarranted engineering services and other fees based upon their participation in fraudulently denying legitimate insurance claims. U.S. Forensic routinely submitted charges for engineering services which bore no relation to the actual amount of work performed on an individual case. Wright Flood paid these fraudulent invoices without question using the funds of the federal government.

76. Wright Flood intentionally denied or underpaid insurance claims.  By diminishing the amounts paid on claims, Wright Flood avoided a government audit on payment amounts and on the actual cost of administering the WYO program. Additionally, due to the reverse incentives, Wright Flood stood to benefit directly from increasing claims handling costs upon which their payments from FEMA were based.

77. Plaintiffs and Class Members have been injured in their business or property by Defendants' overt acts of mail and wire fraud. Plaintiffs' legitimate claim for their entire insurance policy

of $250,000 was denied by Wright Flood based on fraudulent engineering reports which directly reduced the amount paid to less than $80,000.

**Pattern of Racketeering Activity**

78. U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343 as described above, within the past ten years. In fact, U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime have committed multiple acts of racketeering activity. Plaintiffs' and Class Members' claims were fraudulently denied in whole or in part on different dates, proving separate and definable predicate acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs and Class Members.

79. The multiple acts of racketeering activity which Defendants committed and/or conspired to commit, or aided and abetted acts, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## CLASS ACTION ALLEGATIONS

80. Plaintiffs were the victims of a corrupt and fraudulent criminal enterprise which resulted in deprivation of over $150,000 in legitimate insurance benefits. Plaintiffs have discovered evidence that other persons similarly situated have been victimized in a similar manner.

29

Plaintiffs have uncovered a fraudulent scheme whereby engineering reports were fraudulently altered to avoid paying legitimate insurance claims. Plaintiffs have also discovered several instances where payments to the engineering companies were made regardless of the time and money expended.

81. Plaintiffs bring this action against Defendants on their own behalf and, pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, as a class action on behalf of a class of persons similarly situated which include the following:

> **All persons or entities who were insured by Wright Flood and filed a flood claim between January 1, 2011 through the present and whose claim was denied in whole or in part based upon an engineering report that was altered by U.S. Forensic after the inspecting engineer's report was submitted to U.S. Forensic for "peer review" or similar purpose.**

82. Excluded from the Class are Defendants, any entity in which one or more of the Defendants has a controlling interest or is a parent or subsidiary of said Defendants, any individual or entity already represented by counsel for these offenses, or any entity that is controlled by one of more of the Defendants and any of their officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

83. There are hundreds of members of the Class. Accordingly, the Class is so numerous that joinder of all members is impracticable. The Class is ascertainable, as the names and addresses of all Class Members can be identified in business records maintained by Defendant U.S. Forensic and/or Wright Flood.

84. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other Class

Members. Plaintiffs are represented by counsel experienced and competent in the prosecution of complex class action litigation.

85. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. Such common questions include, *inter alia*:

    a.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime have engaged in a scheme to deny legitimate insurance claims;

    b.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime have engaged in a scheme to improperly and unlawfully alter engineering reports;

    c.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime are purposefully prolonging litigation for their own financial gain;

    d.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime have engaged in these wrongful acts to avoid audits, thereby causing the denial in whole or in part of Class Members' claims;

    e.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime have engaged in mail and wire fraud;

    f.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime have engaged in a pattern of racketeering activity;

    g.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime constitute an enterprise within the meaning of 18 U.S.C. § 1961(4);

    h.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime conducted or participated in the affairs of the U.S. Forensic Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) through means including false sworn testimony;

    i.    Whether U.S. Forensic's, Bell's, Garove's, Hernemar's, Wright Flood's, Colonial's, and Maxime's overt and/or predicate acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to Plaintiffs' and Class Members' business or property; and

    j.    Whether U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime fraudulently concealed their scheme.

86. Plaintiffs' claims are typical of the claims of the Class Members because they originate from the same illegal, fraudulent, and confiscatory practices of U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime. U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime acted in the same way toward Plaintiffs and the Class.

87. Plaintiffs will fairly and adequately protect the interests of the Class Members, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class litigation and have no interests antagonistic to or in conflict with those of the Class.  As such, Plaintiffs are adequate Class representatives.

88. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the Class.

89. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Further, the expense and burden of individual litigation make it impossible for all the Class Members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIOLATION OF 18 U.S.C. § 1962(c))

90. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

91. This claim for relief arises under 18 U.S.C. §1962(c).

92. As set forth above, U.S. Forensic, Bell, Garove, Hernemar, Wright Flood, Colonial, and Maxime have violated 18 U.S.C. §1962(c) by conducting or participating, directly or

indirectly, in the conduct of the affairs of the U.S. Forensic Enterprise through a pattern of racketeering.

93. As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts which make up the defendants' patterns of racketeering activity through the U.S. Forensic Enterprise.

94. Specifically, Plaintiffs and Class Members have been injured in their business or property by having their legitimate insurance claims denied in whole or in part as a result of the scheme.

## DAMAGES

95. Plaintiffs were denied their legitimate claim for policy benefits which resulted in a loss exceeding $150,000.  The denial of Plaintiffs' claim thwarted Plaintiffs' ability to properly restore their property, which also resulted in lost rental income and the loss of economic value of the home, which was sold for the value of the property. Under 18 U.S.C. §§ 1964(c), Plaintiffs are entitled to treble damages, costs, attorney's fees, and prejudgment interest.

## JURY DEMAND

96. Plaintiffs demand a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and in favor of the Class Members against Defendants as follows:

A. Determining that this action may be maintained as a class action under FED. R. CIV. P. 23(a) and (b);

B. Declaring that Defendants have violated Section 1962(c) of RICO;

C.  Ordering Defendants to pay treble the amount of damages suffered by Plaintiffs and the Class as a result of Defendants' violations of Section 1962(c) of RICO;

D.  Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and the reimbursement of expenses in amounts to be determined by the Court;

E.  Awarding prejudgment interest; and

F.  Granting such other relief as this Court deems to be just and proper.


DATED: November 21, 2014


Respectfully submitted,

**THE MOSTYN LAW FIRM**

 */s/ J. Steve Mostyn*
J. Steve Mostyn
JM9387
Texas State Bar No. 00798389
3810 West Alabama Street
Houston, Texas 77027
(713) 861-6616 (Office)
(713) 861-8084 (Facsimile)
***Pending Admission Pro Hac Vice***


**DENIS G. KELLY & ASSOCIATES, P.C.**

*/s/ Denis G. Kelly*
Denis G. Kelly
DK7734
New York State Bar No. 2520906
74 West Park Avenue
Long Beach, NY 11561
(516) 897-0800 (Office)
(516) 897-0812 (Facsimile)


**ATTORNEYS FOR PLAINTIFFS**